## EMMA HARDWICK, Administratrix, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

**Kansas City Court of Appeals, March 2, 1914.**

1. **NEGLIGENCE: Carriers: Employee: Circumstantial Evidence.** Though no one saw a railway engine strike an employee working on or beside the track, yet a case for damages on account of such striking may be sufficiently proven by circumstantial evidence.

2. ————: ————: **Federal Employer's Liability Act: Contributory Negligence: Verdict: Instructions.** Under the federal statute known as "Employer's Liability Act," contributory negligence of an employee is not a bar to recovery; though it should be considered in fixing the damages, and the jury should be so instructed.

3. ————: ————: **Federal Statute: Action in State Court: Authority.** Though an action is based on a federal statute, a state court having jurisdiction of that class of actions has jurisdiction of such case, but such court is governed by the construction placed upon the statute by the Supreme Court of the United States.

4. ————: ————: **Interstate and Intrastate Commerce: Train: Cars for Different States: Local Employees.** A railway carrier's road extended into several states, including Missouri. It engaged in both interstate and intrastate commerce. A train starting out from St. Louis, Missouri, and the main part of which was bound for Kansas City in that State, had cars and passengers for points in Iowa, which were detached from the main train at two divisional points in Missouri. The road passed through a town in the latter State on a night when snow was falling and a local employee (a section man) was engaged in sweeping the snow from the switches connecting with the main track, so as to safeguard the track. It was *held*, that such employee, in such labor, was engaged in interstate commerce under the Federal Employer's Liability Act.

5. ————: **Carriers: Employee: Duty.** A railway carrier does not owe to an employee working on its track the duty, in all its strictness, which it owes to a passenger or stranger; yet it is not absolved from all duty, under all circumstances.

6. ————: ————: **Clear Track: Duty of Employee: Duty of Carrier: Lookout.** While the servants of a railway carrier in charge of its engine, as regards employees on the track, are

generally entitled to expect a clear track; yet if a section man is engaged on a stormy night in sweeping snow from the switches at a station, and the servants on the engine pulling a train at forty miles an hour, not stopping at such station, knew that on such nights section men were kept engaged at sweeping the falling snow from the switches at stations, it is their duty to keep a lookout for such section men.

7. **EVIDENCE: Pecuniary Loss: Verdict: Instructions.** The evidence in an action for the death of an employee under the. federal statute of Employers Liability, should show the pecuniary loss of each beneficiary in the verdict, and the jury should state each one's loss and the jury should be so instructed. But if the defendant asks no instruction of that kind, and no objection is made at the trial on that account, it is not reversible error.

Appeal from Chariton Circuit Court.—*Hon. Fred Lamb,* Judge.

AFFIRMED.

*J. L. Minnis* and *J. A. Collet* for appellant.

(1) At the close of plaintiff's case, the court should have directed a verdict for defendant. The evidence wholly failed to show any violation of any duty owed by the train men to the deceased, hence there was nothing upon which to predicate negligence. Cahill v. Railroad, 205 Mo. 393; Evans v. Railroad, 178 Mo. 508; Degonia v. Railroad, 224 Mo. 564; Van Dyke v. Railroad, 230 Mo. 259. (2) Defendant's refused instructions, numbered 5 and 6, which directed the jury that the operators of defendant's train had a right to expect Hardwick to look out for the approach of the train and protect himself, and that they were not bound to look out for said Hardwick or give him warnings of the approach of the train until they saw him in a place of danger, and under such circumstances as indicated that he was oblivious of his danger. Aerkfetz v. Humphreys, 145 U. S. 419; Degonia v. Railroad, 224 Mo. 564; Nivert v. Railroad, 232 Mo. 626; Ginnochio v. Railroad, 155 Mo. App. 163.

(3) Defendant's refused instruction No. 7 should have been given. Dickson v. Railroad, 109 Mo. 413; Schlereth v. Railroad, 115 Mo. 87; Swadley v. Railroad, 118 Mo. 268; Sullivan v. Railroad, 97 Mo. 113; Moore v. Railroad, 85 Mo. 588.

*Phillips & Phillips* and *Gilbert Lamb* for respondent.

At the time deceased Hardwick received the injury which resulted in his death, he was engaged in interstate commerce, within the meaning of the Federal Employer's Liability Act, as amended in 1910. Pederson v. Railroad, U. S. Sup. Ct. Rep., Advance Sheets, July 1, 1913, p. 648; Colasurdo v. Railroad, 180 Fed. Rep. 832; Darr v. Railroad, 197 Fed. Rep. 665; Railroad v. Maerkl, 198 Fed. Rep. 1; Mondou v. Railroad, 223 U. S. 327; Johnson v. Railroad, 178 Fed. 643; Zikes v. Oregon R. & Nav. Co., 179 Fed. 893. (2) Under the Federal Employer's Liability Act, the contributing negligence of the deceased Hardwick, if any, would not be a bar to plaintiff's recovery. U. S. Comp. Stat. Supp., 1910, p. 1171; 36 Stat. at L. 291, chap. 143. (3) The evidence of the cause of decedent's death and that it was the result of defendant's negligence, in this case, is sufficient to sustain the finding of the jury, and is not speculative. Cahill v. Railroad, 205 Mo. 403; Rine v. Railroad, 100 Mo. 228; Settle v. Railroad, 127 Mo. 341.

ELLISON, P. J.—John Hardwick was an employee of the defendant and was killed by one of its trains running upon him. Plaintiff is his widow and was appointed administratrix of · his estate. She brought this action for damages; charging defendant with negligence and recovered judgment in the circuit court. There are several living children.

Hardwick was struck at a switch about two hundred feet east of defendant's station building at Salis-

bury, Missouri, at about five o'clock on the morning
of November 28, 1911, that being before daylight at
that time of the year. The night was cold, with a
high wind drifting the falling snow. Witnesses de-
scribed it as a "stormy morning; awful bad." De-
ceased was a section man and had been engaged
through the night, with others, in sweeping snow from
the switches connecting with the main track about
this station. At about five o'clock, he and one Givens
left the station, the latter going to a coal house to get
a shovel, while deceased went on to the switch with his
short handled broom, salt bucket and lantern. That
was the last he was seen in a conscious condition. De-
fendant's train was more than a half hour late, and it
approached the station, through the storm at a speed
of about thirty-five miles an hour and did not stop.
The track was straight for a long distance and the
headlight was burning. Defendant's engineer and fire-
man knew that on such nights section men endeavored
to keep the switches at stations cleared of drifting
snow. No whistle was blown except at the whistling
board before reaching the station and no bell was rung
as the cord was wrapped around the engine valve. A
light could be seen that night a distance of nine or
ten hundred feet; the fireman testified that he saw
the semaphore light at the station that far off. De-
ceased was found ten or twelve feet from the switch,
not dead, but unconscious. His broom was found and
blood was seen between two and three feet of the track
and his lantern was near by. He was struck in the
forehead, perhaps by the end of the front crossbeam
of the engine as, too late, he raised his head; other
parts of his body did not appear to have been injured.
Without going further, we will say that there can be
no serious question that a case was made for the jury
on the disputed point whether deceased was struck
without warning by the engine. Circumstances alone
frequently will suffice to make a case. [Kelly v. Rail-

road, 141 Mo. App. 490; Pittsburg C. C. & St. L. Ry. Co. v. Scherer, 205 Fed. 356.] Reasonable inferences drawn from affirmative facts proven are evidence and not presumptions built upon other presumptions, as suggested by defendant.

A great deal has been said in argument about deceased contributory negligence in that there was no reason, short of heedlessness, why he did not observe the approach of the train on a straight track with a brilliant headlight, even if he was stooping over with his head down. But that part of defendant's insistence is outside the case, except as it may lessen the amount of damages. In other words, whatever contributory negligence deceased may have been guilty of cannot be considered as affecting plaintiff's right of recovery, though it may influence the amount. This for the reason that defendant is an interstate carrier and the case is founded on the Act of Congress known as the Employer's Liability Act (35 Stat. 65, c. 149, and amended of April 5, 1910, 36 Stat. 291, c. 143); which, as against an interstate carrier, abrogates the rules of law obtaining in this State allowing an employee's contributory negligence to bar a recovery of damages, and only allows such negligence to diminish the damages allowed; see section 3 of such statutes as set out in Second Employer's Liability cases. 223 U. S. 7. And of this the jury should be informed by appropriate instructions. Though the authority of Congress as it relates to interstate carriers, is paramount to that of the State, yet where a state court has jurisdiction of the class of actions embraced within the Federal statute, resort may be had to such courts for the enforcement of claims arising on such statute. Second Employer's Liability Cases, 223 U. S. 1, 59; Penderson v. Deleware, L. & W. R. Co., United States Supreme Court, 229 U. S. 146. It being understood that relief to be had or denied will be governed in such courts by the rulings of the Federal courts in the con-

struction of such statute, appeal lying to the United States Supreme Court from the judgment of the courts of last resort which have jurisdiction of such cases in the State where the action is instituted. [M., K. & T. Ry. Co. v. Elliott, 184 U. S. 530; Gulf, Colorado & C. Ry. Co. v. McGinnis, 228 U. S. 173.]

It is, then, of the first importance to ascertain if deceased was engaged in interstate commerce in sweeping the snow from the switch connections in defendants' tracks. It was shown that defendant is a railway carrier extending from Illinois, through Missouri into Iowa. It was, as we have already said, an interstate carrier as defined by the Federal statute; but it was likewise an intrastate carrier; and the record here shows that the train in controversy was engaged in both capacities. It was passing through Missouri from St. Louis on the east, to Kansas City on the west border of that State, and some of the cars in the train were to be attached at a divisional station to another engine and perhaps other cars to be thence taken to a point in Iowa, and others at another station were to be attached to an engine and other cars to be taken to another point in Iowa. The place involved in this controversy was between those points. The train was, therefore, actually engaged in both inter and intrastate commerce.

In these circumstances, deceased, though in a sense, a local employee doing only local work in Missouri, was engaged in interstate commerce. [Penderson v. Delaware, L. & W. R. Co., supra.] In that case the defendant carrier was doing both interstate and intrastate commerce, though the particular train which injured plaintiff was engaged in the latter service only. The plaintiff in that case was carrying some bolts or rivets to one of the carrier's bridges then being repaired and while walking across another bridge was negligently run down and injured by the intrastate

181 App. 11

train. It was held that the plaintiff was engaged in interstate commerce. In the course of the opinion Justice VAN DEVENTER asked and answered these questions: "Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier?

The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large measure upon this being done."

After referring to the Federal statute, the Justice proceeds: "But independently of the statute, we are of the opinion that the work of keeping such instrumentalities in a proper state of repair while thus used, is so closely related to such commerce as to be in practice and in legal contemplation, a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements, and the nature of each determined regardless of its relation to others, or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged." The Justice further said that it was "True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce."

Applying this reasoning to the deceased and the
service he was performing when killed, it entirely jus-
tifies our conclusion above stated, that he was engaged
in interstate commerce. It was necessary to the opera-
tion of such commerce that the tracks, over which peo-
ple and freight were conveyed through different states,
should be kept free from ice and snow so as to be rea-
sonably safe for trains in passing over connecting
switches.

Though deceased was so engaged, and though his
contributory negligence will not prevent plaintiff's re-
covery, there yet remains the question whether defend-
ant was guilty of negligence; for that, of course, is the
foundation upon which liability must rest.

If defendant's servants saw deceased and ob-
served that he was oblivious to his danger, should
they have attracted his attention by sounding an
alarm? It is clear, as insisted upon by plaintiff, that
they could have seen him, in time to have attracted
his attention, if they had been on the lookout, and if
they did not see him in time, it was because they failed
to look. We think the evidence sufficient to make a
question for the jury whether defendant's servants
actually saw him and could have observed that he was
oblivious to his danger, in time to have saved him.
As has been stated, the fireman saw the semaphore
light (which was small) as much as 900 feet away.
That light was above the track but deceased and his
lantern were between him and it, and we think it is a
permissible conclusion or inference that he saw the lan-
tern, and the deceased.

The circumstances have been mostly stated, in-
cluding the time, the extremity of the cold, the char-
acter of the driving wind and the drifting snow. The
engineer was not a witness, but the fireman testified
that they knew section men on such nights would be at
work clearing snow off the switches at stations. De-

ceased's position was such that a blast of the whistle would have alarmed him in time to save himself.

But defendant insists that not only was it not the duty of those in charge of the engine to be on the lookout, but that it owed him no duty even if its servant had seen him on the track. We do not think that statement is justified, in its full breadth, by the rulings of the courts. Reliance for its support is placed upon Aerkfetz v. Humphreys, 145 U. S. 418. But that case, while stating that the duty owing to an employee on the track, is not to be measured by that owing to a passenger or stranger, by no means absolves the railroad company from *all* duty. The very fact that the court used the expression that, "the *measure* of duty to him (an employee in the yard) was not such as to a passenger or stranger," is a concession that there is some duty. And as a reason why the engineer was held blameless in that case it is well to notice that he was not in a position to see up to a point where he could have noticed the employee was oblivious to his danger, for he was pushing two freight cars ahead, and this was being done very slowly; the court said that from the noise and distraction from other bells and whistles in the yard, it would have but added to the confusion to have rung the bell or sounded the whistle of the engine, and that in such situation it could not be expected the railway company should have sent a man in front of the cars to notify employees off the track. The face of the case, including the line of the reasoning supporting the conclusion, clearly shows the court recognized, that while no duty was owing under the particular facts of that case, a duty might be owing to trackmen, though of less strictness and comprehensiveness to that owing to a passenger or stranger.

That this is true is made apparent by a recent decision of the United States Supreme Court in Norfolk & W. R. R. Co. v. Earnest, 229 U. S. 114, based, as is this action, on the Federal statute, and must there-

fore control this case. The injured party in that case, as in this, was at work at night in the yards of the railway company. The service which occasioned his injury was "piloting" a locomotive, in charge of an engineer, through several switches out on to the main track where it was to be attached to an interstate train. In doing this he walked ahead of the engine with a torch until he reached the first switch which, finding in proper position, he signalled the engineer and advanced along the track between the rails to a point near the next switch, when the engine overtook and injured him so that it became necessary to amputate his leg. He had not signalled the engineer for the second switch and it was a question whether the engineer was negligent in not waiting for a signal. But there was no dispute as to the duty of the pilot to go ahead and see if the switches were in proper position and that it was the duty of the engineer to keep control of the engine and to follow up at the rate of not more than three or four miles an hour. It was admitted by the pilot that he did not look out for the engine and admitted by the engineer that he did not look out for the pilot. In these circumstances, the Supreme Court of the United States sustained the trial court in refusing to instruct the jury, as requested by the railway, "that the engineer was not required to keep any lookout for the plaintiff." And approved an instruction given for the plaintiff that "If the jury believes from the evidence that it was necessary or usual within the knowledge of the engineer for the plaintiff to walk on, along or over the tracks of the defendant company in front of the engine while it was moving, in order to properly perform his duties of piloting the engine out of the yard, it was then the duty of the defendant company, through its engineer in charge of the engine, to use reasonable care and caution in the management of the engine and to keep such a lookout for the plaintiff as an ordinarily prudent and careful

man would have done under the circumstances, to avoid running the engine upon or over the plaintiff; and if the engineer did not," etc., the finding would be for the plaintiff. In support of this instruction the court said, "There was evidence tending to show that it was usual for the pilot to walk between the rails in advance of the locomotive, that the conditions outside the track made it necessary to do so in the nighttime, and that all this was known to the engineer. Whether this evidence was true was for the jury to determine, and if it was true it certainly could not be said as a matter of law that the engineer was in the exercise of ordinary care, which was the controlling standard for him, if he made no effort to see whether the plaintiff was on the track and took no precautions for his protection."

It is readily seen that these remarks will directly apply to the evidence in this case. Here the engineer and fireman knew of the terrific and blinding snow storm then on; they knew that in such nights track or swithmen would be out in the storm at stations keeping the switches clear. They expected such men would be so engaged at this station on this night. It cannot be said as a matter of law, that with such knowledge those servants owed no duty to look out for the men thus engaged, so as to warn them of danger.

In Southern Railway Co. v. Smith, 205 Fed. 360, the party killed was a switch tender; and the court stated the question decisive of the case was whether the evidence showed "a lack of due care on the part of the engineer in not observing Smith (deceased) upon the track." The court repudiated the statement that Aerkfetz v. Humphrey, supra, was authority for the position that no duty was owing to the trackmen from those in charge of the engine. Speaking directly of the case before it the court said: "We cannot say that there was no duty whatever to keep a lookout for Smith. Doubtless, it was primarily Smith's duty to

keep out of the way, but this did not absolve the engine crew from all obligation. The care required and the duty imposed with reference to the yard employees seen upon the tracks are much less in degree than with reference to strangers; but defendant's theory of no duty would extend to a case where an employee was obviously helpless on the track and might have been seen for some time from the coming engine. It would permit the engine crew to run through the yard with their eyes shut, and it is too broad. Under such facts as here exist, there must be a concurrent or secondary duty, independent of statute or rule, to keep such lookout as is reasonably necessary to avoid injury to the employee who may neglect his primary duty to protect himself.''

It has been frequently held by the Supreme Court of this State in cases where those in charge of the engine saw an employee on or near the track, and saw that he was in peril and that he was oblivious to his danger, in time to warn him it was their duty to do so. [Hinzeman v. Railroad, 182 Mo. 611; Hinzeman v. Railroad, 199 Mo. 56.]

Defendant, however, contends that those cases, and others of like nature, are overruled in Degonia v. Railroad, 224 Mo. 564. While plaintiff insists that by reference to the close of the opinion in that case it will be seen the majority of the court refused to interfere with the Hinzeman cases. She also insists that the cases are unlike in a vital particular, viz., that in the Degonia case the engineer did not see the injured party, while in the Hinzeman cases he saw such party from the time he was five hundred feet away until he was struck.

But we need not go into a discussion of those cases for the reason that since they were announced the Supreme Court has discussed and decided the question. [Gabal v. Railroad, 251 Mo. 257.] Undoubtedly the rule is stated in that case that it is the duty of

section men and switchmen about the railroad yards "to look out for themselves, and this imposed duty licenses the belief upon the part of the operator of the engine that such an employee, although in a place of danger, will upon the approach of the cars, step to one side and avert the danger." The court proceeds to say that, "In such cases the humanitarian rule cannot be invoked upon the mere seeing of the man in a dangerous position, but can only be invoked from the time that the operator of the engine sees that the man is not going to protect himself, as is usually done in such cases, by taking a step or two to one side." Now while the court says that in instances about switch yards an engineer in charge of an engine only owes a duty after he sees that such employee is oblivious to his danger—"that he is not going to protect himself by taking a step or two to one side"—yet the court does not say that there are no instances in which a duty would be owing to such employees in other situations. On the contrary Judge Graves in stating the general rule uses language, as do all the courts expressing similar views, which would allow of other instances, he says, "An employee in such a yard stands upon a *somewhat different footing* from a passenger or stranger in other cases." And that "the *measure* of duty to him was not such as to a passenger or a stranger." And that "it will not do to apply this rule *in all its strictness* to section men," etc. (Italics ours.) [Evan v. Railroad, 178 Mo. l. c. 517.] These words we think fairly imply that situations may call for a lookout by those in charge of a passenger train coming into a city and passing through without stopping, at a speed of thirty-five or forty miles an hour. In a case of much less necessity for application of this rule than this presents, the Supreme Court approved of an instruction stating it was the duty of the engineer to see the employee if he could be seen. [Cahill v. Railroad, 205 Mo. 393, 405, 406.]

The petition charged that defendant's servants, in charge of the engine, knew that on such a night it was necessary to keep an employee sweeping the snow from the switches in the city of Salisbury and that in passing through said city and by its station building at a high rate of speed, without stopping, it was the duty of such servants in charge of the engine to keep a lookout for such employees and that it was their duty in passing through to ring the bell or sound the whistle. In passing through a city like Salisbury, it was defendants duty to ring the bell (Sec. 3140, R. S. 1909). The fireman testified he could not ring it because the bell cord had been thrown or "wrapped around the relief valve leading from the steam dome" by the wind; and that he did not discover this until he went to ring it "when approaching Salisbury." That there was no "rope carrier" on that engine and that, if there had been, this would not have happened. That engines were provided with rope carriers and the rope passed through them "which keeps it from blowing around." Though the bell could not be rung, no warning of the trains coming was given by whistle or otherwise.

The law is settled by an unbroken line of decisions in personal injury cases other than in behalf of employees, that the injured person has a right to rely on the railroad company obeying the law or ordinance as to speed or as to ringing the bell. [Petty v. Railway Co., 88 Mo. 306, 319; Sullivan v. Railroad, 117 Mo. 214, 222; Hutchison v. Railroad, 161 Mo. 246, 254; Weller v. Railroad, 164 Mo. 180, 199; Riska v. Railroad, 180 Mo. 168, 190; Mockowick v. Railroad, 196 Mo. 550, 571.] It has, however, been repeatedly held, in this State, that the general statute requiring the bell to be rung does not apply in favor of employees upon the track—that the *statute itself limits* its application to persons crossing a public highway. [Degonia v. Railroad, 224 Mo. 564, 592-594.]

But the latter rule would not apply to an ordinance of a city, general in its terms. The question has frequently been up concerning ordinances regulating speed and it has been held that employees would not be excepted from the protection of such ordinances. [Bluedom v. Railroad, 108 Mo. 439, 447; Camp v. Railroad, 124 Iowa, 238; Railroad v. Gilbert, 157 Ill. 254, 368; Railroad v. Eggman, 170 Ill. 538.] "Their benefit may be claimed by any person coming within their protection." But plaintiff cannot claim the benefit of this since she did not plead or prove an ordinance.

But regardless of the presence or absence of statutory law, state or municipal, there is a general law, springing from the plainest dictates of common prudence, to say nothing of humanity, whether in behalf of a stranger or servant, that in running through populous localities, at high speed, those in charge of a railway train should be on the lookout. In Lloyd v. Railroad, 126 Mo. 595, 606, the court said "there was nothing to obstruct the view and prevent the engineer, if he was at his post, as he should have been when coming into a depot or crossing a public road or street, from seeing both Lloyd and Gray." The same thing is said in Kelly v. Railroad, 75 Mo. 138, 141, 142. In a town or city the servants in charge of a train "should be at their posts, observant of the track, and ready at a moments notice, to avert, if possible, any apprehended danger." [Frick v. Railroad, 175 Mo. l. c. 609.] These statements were made in cases where the injured party was not an employee; but our object in citing them is to show that it was the duty of defendant's servants in charge of the engine, in the circumstances of this case already stated, in passing through Salisbury on the night in question to be on the lookout. That being a general rule of law, not limited or restricted, as is our statute, it applies, as does an ordinance, to the protection of employees. And it has been so applied by our Supreme Court. In Schlereth

v. Railroad, 115 Mo. 87, the person killed was a "track repairer" who was walking along the track in a city and it was held to be the duty of the servants on the engine to keep on the lookout. It was said that this "humane rule of law applied even to a trespasser" guilty of contributory negligence. The court continuing, at page 101, 102, said that a "well recognized rule of law, founded upon principles of humanity, requires those running engines and trains through populous cities to exercise reasonable care to discover and avoid injuring those at least who may be upon the track by right or license." That although the railway rules "requires trackmen at all times to look out for and avoid engines and trains while they were walking or working on the track, these rules required no more than the instincts of self preservation dictated, and did not relieve those in charge of engines and trains from the duty of looking out for them, as well as others, in thickly inhabited localities. While, therefore, deceased may have been guilty of contributory negligence in walking upon the track, and not seeing the engine, we think the evidence sufficient to have required a submission to the jury of the issue as to whether the engineer used proper care to see the danger in which the deceased had placed himself, and to avoid injuring him." And in Sullivan v. Railroad, 97 Mo. 113, the rule was applied even in the country in behalf of a track walker who carelessly stood looking at the working of a steam shovel, the engineer knowing, as in this case, that persons were at work at that place. The court said, at page 119, that, "Sullivan was not a wrongdoer because on the track. He was where he had a right to be; and while there is evidence tending to show that he was guilty of negligence, there is evidence tending to show that his life could have been saved by the use of ordinary care on the part of the engineer and fireman, and that they failed to exercise that care. Indeed, although the fireman and engineer

saw Sullivan on the track, and saw that his attention was attracted to the steam shovel, still there is evidence that no signal was given until the instant the engine struck him. The fireman and engineer knew that a gang of men were working at the point where the deceased was killed, and it was their duty to keep careful watch, and especially so in view of the curve which prevented an approaching train from being seen until within about two hundred or two hundred and fifty yards of the place of the accident.''

It may be said that deceased in regulating his conduct and care for his own safety, had no right to rely upon the performance of this duty by defendant's other servants and that if he did, he was guilty of contributory negligence which will prevent his recovery. In a variety of cases in other jurisdictions it is held that he has such right. [Camp v. Railroad, 124 Iowa, 238; North. Ala. Railroad v. Key, 150 Ala. 641; Richmond Railroad v. Farmer, 97 Ala. 141; C. & A. Railroad v. Eaton, 194 Ill. 441, 445; Shoner v. Railroad, 130 Ind. 170, 177, 178; Graham v. Railroad, 95 Minn. 49, 53; C. & A. Railroad v. House, 172 Ill. 601; Pitman v. Railroad, 231 Ill. 581.] If it be conceded that in this State, even in his situation, an employee could not so rely, and could not govern his conduct for his own safety in that reliance, without being guilty of contributory negligence, yet that would not bar the right of recovery for deceased death; for the action is under the Federal statute which only regards contributory negligence as diminishing damages. But having shown it was the duty of defendant's servants to be on the lookout we have justified the instruction to that effect as it relates to the question of it being negligence not to keep a lookout at such a time and place.

As has been already stated, this case appeals much more forcibly in behalf of an instruction to the effect if defendant was seen, *or could have been seen* if there had been a lookout, than does Cahill v. Railroad, su-

pra. For here, not only was the train running at great speed through a city, but, defendant's servants knew that some one or more men would be engaged in sweeping the snow, the latter fact alone being held sufficient in the Cahill case. The court said (p. 405), "It was also the custom of the company to send a sufficient force of men to the tracks in the yards in time of snow-storms, as on the night of the accident, to clear the switches of snow, and the evidence showed that upon the night in question there were four men, including the deceased engaged at this work, and being in the service of defendant company, the engineer must have known it. These facts, we think, authorized that part of the instruction under consideration."

Defendant has insisted that it was not guilty of negligence under the following cases decided by the Supreme Court of this State: Degonia v. Railroad, 224 Mo. 564; Rashall v. Railroad, 249 Mo. 509; Van Dyke v. Railroad, 230 Mo. 259; Nivert v. Railroad, 232 Mo. 626 and Evans v. Railroad, 178 Mo. 508. Neither of these cases is like this one in *essential governing* facts and neither was under the Federal Employer's Liability Act; and in each of them (except the Nivert case which was tried on the pleadings) the employees contributory negligence barred a recovery, whereas, under the Federal statute, already stated, such contributory negligence does not bar him. Those cases are bottomed on the idea that an employee, must take care of himself; whereas an interstate employee, may not be so careful and prudent and yet have a legal claim for damages.

In the Degonia case, the accident happened to a track employee at or near a little village (p. 569) inside the inclosed private yards of the railway company and the place had not been used by the public (pp. 590, 591, 592). It is manifest from the discussion found in those parts of the opinion that the court regarded the failure to show a public user prevented an appli--

cation in that case of the rule which requires those in charge of an engine and train to be on the lookout. That if no public user is shown, a clear track may be expected for that reason (587). The second instruction for plaintiff in that case submitted the question of the duty of the railway company's servants to be on the lookout for the deceased employee and the court held it to be improper, *for that reason*; stating at the close of that branch of the case (p. 592) that plaintiff having "failed to both plead and prove a public user of such tracks, the doctrine of clear track follows and defendant under such circumstances cannot be held liable unless it be shown that its servants in charge of the engine actually saw deceased in a position of peril," etc.

In this case the place, both pleaded and proven, was within a few feet of the station building in Salisbury, a city shown by the census to be of more than 2600 population. It was a place, as we have shown above, where every dictate of prudence would suggest that there was no right to expect a clear track. Besides, that fact, in that case no one was expected to be engaged at work at the place of the accident; while in this case, it was conceded that those in charge of the engine expected that deceased, or some like person, would be at work in the storm. In that case the engineer did not see the deceased and he went on the track when train was within fifty or sixty yards of him (p. 599). While in this case, as already pointed out, the testimony of the fireman tends to show that deceased could have been seen a long distance off. It is significant that the engineer was not called to testify, an omission of such significance as to require consideration. [Reyburn v. Railroad, 187 Mo. 565, 575; Baldwin v. Whitcomb, 71 Mo. 651; 22 Am. & Eng. Ency. of Law (2 Ed.), 1261.]

The Rashall case is wholly unlike this in its facts. There the injured party got upon the track in the

company's yards and got his foot fastened when the engine was practically upon him and too late to attract the engineer's notice though he was at his post. In that case the Degonia decision is approved and the court stated that, "The reason is, that railroads are required to exercise at all times a degree of care and vigilance commensurate with the occasion. This implies a duty on their part correlative with the danger to be encountered. Hence in passing portions of their tracks subjected to public use or license, they are charged with a knowledge of what is actually seen or what could *be seen* by proper care."

So the Van Dyke case has no likeness to this. There the accident happened in the private fenced yards of the railroad company (p. 262). The deceased stepped on the track "nearly directly in front of the train" (p. 282). And the engineer besides giving warning signals, used every effort to save him (p. 283).

The Nivert case was tried on the pleadings and it is also unlike this, though in the opinion of one of the concurring members of the court, it is said (p. 648) "that on a steam railroad *in the country, away from congested populations* and between crossings, there is no general duty to lookout for persons on the track." (Italics ours).

The Evans case bears no resemblance to this. Section hands were cutting weeds on the right of way. The engineer was at his post and saw them, but did not see deceased get on the track. The bell was rung constantly, and the whistle sounded a number of times finally with three or four "quick blasts." The men separated and deceased stepped in front of the engine (pp. 511, 512). No question in that case of duty to look, for the engineer was looking and gave every warning and did not see deceased in place of danger at all.

The case of Gabel v. Railroad, 251 Mo. 257, supra, did not involve the question here, as is shown at page 262, where it appears that the question whether those in charge of the engine might have seen if in the exercise of ordinary care, was abandoned.

It is well to have analyzed these cases for they help to show plaintiff's legal right on the facts of this case. It seems to us that the reasons given by the court for the rulings made in them clearly indicate, or, we may say, that in a negative way they assert, that if the court had been considering a case like this, the holding would have been that those in charge of the engine would have had no right to expect a clear track and that their duty was to be on the lookout. Besides it is significant that all these cases, dating since Cahill v. Railroad, 205 Mo. 393, 405, 406, supra, approve of that case.

These conclusions result in our approval of the trial courts action in overruling defendant's demurrer to the evidence and in giving an instruction for plaintiff to the effect that it was liable though its servants in charge of the engine did not see the deceased, if they could have seen him, and that he was oblivious to his peril, in time to have warned him of his danger, had they been on the lookout.

The verdict was for a gross amount. Properly the evidence should show the pecuniary loss to each of the beneficiaries of the verdict and the jury should state the sum allowed to each. [Gulf, Colo. & C. Railroad v. McGinniss, 228 U. S. 173.] For, as the loss recoverable is the pecuniary loss only, it is apparent, that a child shortly to become of age could not suffer so great a loss in the father's death as his younger brothers and sisters, and the verdict should respond to this obvious fact. But as no instruction of that kind was asked and no objection was made to the verdict and no exception taken, it is not reversible error. [South. Railroad v. Smith, 205 Fed. Rep. 360, 362;

Yazoo & M. V. Railroad v. Wright, 207 Fed. Rep. 281,. 287.]

In Texas a statute requires an apportionment be made by the verdict; and it is held reversible error not to do so. [Railroad v. Moore, 49 Tex. l. c. 45, 46;. March v. Walker, 48 Tex. 376; Railroad v. Legierse,. 51 Tex. l. c. 199, 200; St. L., A. & T. Railroad v. Johnson, 75 Tex. 536, 542.]

But in the same State the omission is held not to be of real or practical interest to a defendant, since the judgment on a verdict in a gross sum would protect him from any future action and if he does not see fit to ask an instruction to that effect at the trial it is not reversible error. [March v. Walker, 48 Tex. l. c. 377; M., K. & T. Railroad v. Evans (Tex. Civ. App. 1897), 41 S. W. Rep. 80; Railway Co. v. Hudman,. 8 Tex. Civ. App. 309.]

The foregoing considerations lead to an affirmance of the judgment. The other judges concur.

## ON MOTION FOR REHEARING.

Since the decision and announcement of the judgment of this court the suggestion is made that we have no jurisdiction. This is put upon the ground that our construction of the Employer's Liability Act brings that statute into conflict with article 10 of the Constitution of the United States. And that such Act denies to the State of Missouri the right to police its own territory and to govern the liability of its citizens while engaged in lawful commerce within its own territory and is therefore in conflict with sections 2 and 3 of article 2, of the Constitution of Missouri known as the Bill of Rights.

This may be properly designated as, in effect, a statement that this court has no jurisdiction of the case unless we decide it for defendant. The result of

the claim, made at this time, would be to put it in the power of every litigant who finds he has lost his case to oust the Courts of Appeals of its jurisdiction.

No question involving the construction of the Constitution of the United States, or of this State, has been presented; nor have we construed either of these constitutions. The decisions of courts, in nearly every instance, deny some right or remedy claimed by the losing party. The constitution demands of the courts that they administer to him his rights and remedies. Therefore, according to this claim, whenever he loses, the courts have decided the case in conflict with and in violation of the Constitution.